Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RICHARD CRAIG KESSER,
*Petitioner-Appellant,*

v.

STEVEN J. CAMBRA, JR., Warden,
*Respondent-Appellee.*

No. 02-15475

D.C. No.
CV-96-03452-PJH

OPINION*

Appeal from the United States District Court
for the Northern District of California*
Phyllis J. Hamilton, Magistrate, Presiding

Argued and Submitted
December 13, 2005—Portland, Oregon

Filed September 11, 2006

Before: Mary M. Schroeder, Chief Judge, Alex Kozinski,
Diarmuid F. O'Scannlain, Pamela Ann Rymer,
Andrew J. Kleinfeld, Kim McLane Wardlaw,
Richard A. Paez, Marsha S. Berzon, Jay S. Bybee,
Consuelo M. Callahan, and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bybee;
Concurrence by Judge Warlaw;
Concurrence by Judge Berzon;
Dissent by Judge Rymer

*Decided and filed together with the companion case of *Leahy v. Farmon*, No. 01-17467, ___ WL ___ (9th Cir. 2006) (unpublished disposition).

10941

**COUNSEL**

William Weiner, Law Offices of William Weiner, San Francisco, California, for petitioner-appellant Richard Kesser.

Russel Covey, Costa Mesa, California, for petitioner appellant Jennifer Leahy.

Michael E. Banister, Deputy Attorney General, San Francisco, California, for the appellee.

**OPINION**

BYBEE, Circuit Judge:

Richard Kesser seeks a writ of habeas corpus on the grounds that the prosecutor struck potential jurors on the basis of their race, in violation of the Equal Protection Clause of the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79 (1986). We hold that, in light of *Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317 (2005), the California Court of Appeal's findings are "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Accordingly, we reverse the judgment of the district court and grant the writ.

# I

After the prosecutor struck three Native American women and one Asian woman from the jury in Kesser's California murder trial, the court conducted an evidentiary hearing under *People v. Wheeler*, 22 Cal. 3d 258 (1978) (California's equivalent of *Batson*), at defendants' request. The prosecutor explained that he struck Debra Rindels, the only Native American on the regular panel, because she worked for a tribe and he feared that she was inclined to favor Native American culture and institutions over "the mainstream system." He also argued that Native Americans were "resistive" and "suspicious" of the criminal justice system, and gave several other reasons for striking each of the other jurors. Here are his explanations in full:

> Ms. Rindels was the one darker skinned female from the regular panel or the group of seventeen that I challenged. My notes indicate that she was my second peremptory challenge. My first was exercised against an older white male. Miss Rindels my notes indicate—the grade I gave her was a C. She was a younger, middle-aged [N]ative American female, Trinidad eight years, Humboldt County twenty-five years. She came to the July 29th hardship. She claimed a hardship because she was in the process of completing an application for HUD funding, which was very important I guess to her, and she was the office manager for an [I]ndian tribe and had been for twelve years. Married fourteen years. Her husband was a foreman for a roofing company, two kids, eighteen and twelve. Her sister worked for Bill Bertain. Her younger sister had been divorced, it was a particularly messy divorce. Someone had been involved with the criminal justice system. That person turned out to be her older daughter. The suspect in that case was her actual father who did a very short period of time apparently in custody. I note she

was a little chubby. I have a note here that says "perm." I don't know what that means. Still a bit emotional and misty. She teared up when she talked about the experience involving her daughter and her father, and she was in Washington for a vacation for a couple of months in late 1991 and had no—no recollection of anything here. She works for the tribe, and when we talk about [N]ative Americans in Humboldt County, we're talking essentially about two tribes or separate nations, the Hupa and the Yurok.

My experience is that [N]ative Americans who are employed by the tribe are a little more prone to associate themselves with the culture and beliefs of the tribe than they are with the mainstream system, and my experience is that they are sometimes resistive of the criminal justice system generally and somewhat suspicious of the system.

She was pretentious in my mind and self-important with the thought that only she could complete the necessary paperwork which would get the grant. She was emotional about the system as I indicated before. Her daughter had been molested by her father, and for that reason I'm assuming that the living situation was indicative of something of a dysfunctional family. I viewed her as somewhat unstable, fairly weak, and somebody who I thought would be easily swayed by the defense.

The prosecutor then explained his strike against Lawton, which removed her from alternate panel:

The first peremptory I exercised was against . . . a younger white male. The second one was against Theresa Lawton. Mrs. Lawton had claimed no hardship, so the first time I saw her was when the Court questioned her during the individualized questioning.

I had given her a C minus based upon her responses to the Court's questions and the defense attorney's questions and the questionnaire.

I noted her to be an older middle-aged [N]ative American female. She lived in Willow Creek, Humboldt County for twelve years. She had been married twenty years. She was a cook, Trinity County Hospital, two children, twenty-two and seventeen. Her husband was a logger. Her husband had been divorced and went to a hearing to pay child support. It had been ordered, and they paid a hundred and seventy-five dollars a month. And her brother-in-law was with the highway patrol in Willets.

It appears someone who was involved in the criminal justice—speed tickets, a D.U.I. over seven years ago. Curly brown hair, fashionable brown blouse, wore earrings, not overly irritated.

She knew about the twins, the Hanson twins, but didn't know about Hanson himself. I believe she indicated that she had followed that trial. Of course [Kesser's counsel] was involved as the lead attorney for the defense which resulted in some very favorable publicity in the local newspapers by [Kesser's counsel]. There was a large article on the case after the verdict came in, extensive interviews with [counsel]. He also was the subject of some national media attention. I'm not familiar with the name of the program, but he did talk to them. The Hanson parents were interviewed about their feelings about the case and the reward that apparently is still outstanding for the killer.

She would be commuting from the Willow Creek area. We're going into the winter. That sometimes is a fairly hazardous commute, although she had been

commuting from where she lived to Trinity County and Weaverville and that is equally hazardous, but sometimes the road is closed, and that sometimes can affect our ability to go forward, and there is a certain flow to the proceedings that I frankly don't like to see disrupted if I can help it.

She was not overly educated. She was weak. She was the person who announced that she would have great difficulty just answering out loud, if the Court asked her if that was in fact her verdict as read, and that she thought that it would affect her ability to render a decision in this case, and that certainly reinforced my first impression of her, which was that she was not a good juror for this particular case.

Finally, the prosecutor explained why he struck Carla Smithfield:

I gave her a C overall. She came in August 31 for the hardship. She was the sole support for her family. She was concerned about her position at Humboldt State where she teaches two year olds, and there was nobody really in her mind who could take her place, and that was I think in her words, fairly important, teacher of two year olds to whom they are attached, apparently to her.

She has some kind of relationship with her—Her husband it turns out is fifty-nine years old and had a stroke last year. She was heavier, wore a flowery lacy blouse. Has cousins apparently down in the L.A. area apparently involved with the police. She knew someone, an uncle, who was arrested for driving under the influence. Her husband is an alcoholic who has been sober for quite a while, and the Court was questioning a lot of people about that. I proposed a voir dire question which I thought would

neutralize some of the Court's questions, because in my mind we kind of left a lot of these people with the impression that somebody who is a recovered alcoholic or recovered drug addict like Mr. Kesser is or Miss Leahy is is somehow, you know, more believable than others.

She also was the individual who wrote a letter to the Court to reemphasize how important she thought her position was and how important that she thought it was that she be there.

. . . .

I would mention Miss Smithfield, I'm not sure, I believed her to be a Chicano and not a [N]ative American, but certainly I'm not expert on guessing somebody's ethnic background.

The court then asked to hear from defense counsel.

[Defense Counsel]: Your Honor, I believe that the expressed concern that [the prosecutor] had, particularly Miss Rindels, is a classic example of what the Court—in fact would be used by the appellate courts as a basis for exclusion, because it's a presumption of a group bias based on a stereotype membership in a racial group, and I think that—

THE COURT: I don't believe that's what it said.

[Defense Counsel]: That's what I heard. Native Americans that work for tribes are a little more prone to identify with the culture of the tribe, and feel alienated and are not willing to accept the— what is perceived to be the wide [sic] judicial system and the ethics and the legal requirements that are imposed on them by that system. That is a stereotype

that is placed upon that lady because she happens to be an [I]ndian and a member of the tribe. That's exactly what it says as far as—that's what I heard him say, and I think that would be pegged by the appellate courts as being exactly the type of impermissible stereotyping that makes that type of peremptory unconstitutional.

[Prosecutor]: I would—

THE COURT: Wait a minute, I want to hear from defense counsel first.

[Prosecutor]: If I could say one thing on that aspect, in this county we've had Dr. Roy Alsop come in here and explain to the courts and I've seen this on the criminal calendar, child molesting is okay in certain [N]ative American cultures, and we can't treat [N]ative American child molesters the same way we treat other child molesters, and have to treat them through the [I]ndian culture center and there are a whole bunch of people that violate our laws that are [N]ative Americans and they go much more often through the [N]ative American system than the criminal system, and to say that does not exist is frankly incorrect. Dr. Alsop went to San Francisco and testified in the Troy case which resulted in the acquittal on a charge of murder, because there was some sort of racial bias that lasted for a long time in Siskiyou County and accounted for the killing of a police officer.

. . . .

THE COURT: All right. The Court finds there is sufficient justification to support the peremptory challenges. With regard to Miss Rindels, my understanding of what [the prosecutor] said is that—

> one of them is at least that she worked for the tribe, not because she was one of the tribe, but she worked for the tribe. That's entirely different, other than the fact if she's [I]ndian, if she is. I gather that she is.

The trial court did not evaluate the sincerity of the prosecutor's nonracial reasons because it did not find any racial animus that would prompt further inquiry. The court ruled that the prosecutor struck Rindels on account of her work with the tribe, not her membership in it or her cultural affiliation with Native American institutions.

Richard Kesser, his wife Jennifer Leahy, and a friend, Stephen Chiara, were tried and convicted of first degree murder on the theory that Kesser and Leahy hired Chiara to kill Kesser's ex-wife so the couple could collect the insurance proceeds. Both were sentenced to life in prison without parole.

The California Court of Appeal reviewed the *Batson* challenge and noted that the trial court had properly found exclusion of an identifiable group, requiring a hearing. *People v. Chiara*, No. A060502 (Cal. Ct. App. Dec. 12, 1995), slip op. at 17. The court revisited the trial court's findings about the prosecutor's motivations, and concluded that, at least in Rindels's case, they presented "some cause for concern" because "the underlying assumption that Native Americans as a group are 'anti-establishment' is itself based on a racial stereotype." *Id.* at 19. After discussing the prosecution's purportedly race-neutral reasons, the court held that, all things considered, the challenge was "based on individual predilections supported by the record." *Id.* at 20. The court noted that the prosecutor said that Rindels was "pretentious" and "self-important" because she claimed that she was the only one in her office qualified to complete a HUD application for the tribe, that she was "emotional about the system," and living in a "dysfunctional family." He labeled her as " 'somewhat unstable, fairly

weak and somebody who I thought would be easily swayed by the defense.' " *Id.* at 19.

Although the court of appeal recognized that the trial court had made no findings on the sincerity of the prosecutor's motivations, it noted that "we give great deference to the trial court in distinguishing bona fide reasons from sham excuses" *Id.* In revisiting the factual determinations that the trial court left incomplete, the court of appeal accepted the prosecutor's explanations without reviewing the voir dire or explaining what evidence (beyond the prosecutor's own *Batson* testimony) supported Rindels's alleged "predilections." The court ultimately concluded that the prosecutor's nonracial reasons for striking Rindels were genuine reasons: "[n]one of them," the court declared, "constitutes a sham excuse." *Id.* The court went on to approve the government's reasons for striking jurors Smithfield and Lawton, calling them "powerful" and "solid" reasons. *Id.* at 20-21. After acknowledging some degree of racial stereotyping and finding that the prosecution had also presented sincere, nonracial reasons for striking the Native Americans, the court concluded that and that "the trial court *could* reasonably have found, based on several race-neutral explanations, that the prosecutor's 'predominant motive' . . . was not ethnic or racial bias." *Id* at 20 (emphasis added).

The California Supreme Court denied the couple's petitions without comment. *People v. Chiara*, No. S051306 (Cal. March 14, 1996). Kesser and Leahy then sought a writ of habeas corpus under 28 U.S.C. § 2254, arguing that the prosecutor's use of peremptory strikes violated the Equal Protection Clause of the Fourteenth Amendment. The district court reviewed the claims under the applicable AEDPA standard, dictated by 28 U.S.C. § 2254, and denied the petitions, holding that although the trial court "commit[ed] serious error in failing to recognize the bias inherent in one of the prosecutor's purportedly neutral reasons," the court of appeal acted appropriately in finding that "race was not the primary reason

given by the prosecutor." *Leahy v. Farmon*, 177 F. Supp. 2d 985, 992, 1001 (N.D. Cal. 2001) (internal quotation marks omitted); *see also Kesser v. Cambra*, No. C-96-3452-PJH 2001 WL 1352607, *8-13 (N.D. Cal. Oct. 26, 2001) (unpublished disposition). We affirmed the district court in a divided decision, *Kesser v. Cambra*, 392 F.3d 327 (9th Cir. 2004), and granted rehearing en banc, 425 F.3d 1230 (9th Cir. 2005). We now reverse.

The racial animus behind the prosecutor's strikes is clear. When he was asked to explain why he used a peremptory challenge to eliminate Rindels, he answered using blatant racial and cultural stereotypes. He identified Rindels as a "darker skinned," "[N]ative American female" and worried that Native Americans who worked for the tribe, like Rindels, were "a little more prone to associate themselves with the culture and beliefs of the tribe than they are with the mainstream system." The prosecutor did not want such Native Americans on the jury because "they are sometimes resistive of the criminal justice system generally and somewhat suspicious of the system." Later in the hearing, he elaborated on his fears of Native American culture when he explained that an expert had testified in a local criminal case that "child molesting is okay in certain Native American cultures" and worried that "there are a whole bunch of people that violate our laws that are [N]ative Americans and they go much more often through the [N]ative American system than the criminal system." The prosecutor emphasized the seriousness of the situation by explaining that not only were Native American child molesters escaping justice, but that expert testimony about Native American culture had recently brought an acquittal to a charge of murdering a police officer.

The prosecutor's obvious fixation with Native Americans was not limited to Rindels. After he struck Rindels, he used two more challenges to strike the remaining Native Americans, potential alternate jurors Smithfield and Lawton, and to remove the only other minority in the venire, Flordeliza

Nakata, whom he described as "brown skinned" but of unknown heritage. At earlier stages of jury selection, the prosecutor acquiesced in the court's excusal of another Native American, and he was the first to stipulate to the release of another potential juror who apparently worked for a tribe. No one from the pool of at least four Native Americans served on what ultimately became an all-white jury.

*Batson* and its progeny, most importantly, the Court's recent decision in *Miller-El*, 545 U.S. 231, 125 S. Ct. 2317, clearly dictate a reversal here, even under the deferential AEDPA standard of review. AEDPA is "demanding but not insatiable." *Id.* at 2325. The California Court of Appeal (whose holdings we review as the last reasoned state court decision) had the duty, under *Batson*'s third prong, to determine whether the prosecutor's nonracial motives were pretextual. The court reviewed the prosecutor's reasons without looking at the voir dire or the jurors' questionnaires, and erroneously found that the race-neutral reasons were not "sham excuse[s]." *Chiara*, No. A060502, slip op. at 20. Without ever considering the evidence outside the prosecutor's own self-serving *Batson* testimony, the court ruled that the strikes were "based on individual predilections supported by the record." *Id.* We need not reach the issue of whether the Court of Appeal was correct in evaluating permissible and impermissible motives to determine the "predominant" motive, because it erred in finding any sincere, permissible motives. *See Batson*, 476 U.S. at 98 n.20-21 (holding that the "prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges" and that the court's findings at this stage "largely will turn on evaluation of credibility" (internal quotation marks omitted)). Even without the benefit of mixed-motive analysis, *Batson* is not toothless in the face of such blatant race-based strikes.

Once an inference of race-based challenges has been established, the court need not accept any nonracial excuse that comes along. *Johnson v. Vasquez*, 3 F.3d 1327, 1331 (9th Cir.

1993). We hold that the California courts, by failing to consider comparative evidence in the record before it that undeniably contradicted the prosecutor's purported motivations, unreasonably accepted his nonracial motives as genuine. We conclude that the California courts' findings are not merely wrong, but "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *cf. Williams v. Taylor*, 529 U.S. 362, 409 (2000) (construing the phrase "unreasonable application of[ ] clearly established Federal law" in § 2254(d)(1)).[1]

## II

**[1]** A *Batson* challenge involves a three-part test. First, the defendant must make a prima facie showing that a challenge was based on race. Second, the prosecution must offer a race-neutral basis for the challenge. Third, the court must determine whether the defendant has shown "purposeful discrimi-

---

[1]The dissent ignores our prior considered decision in *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004), and states that "state court findings of fact are presumed to be correct unless the petitioner rebuts that presumption with *clear and convincing evidence*. 28 U.S.C. § 2254(e)(1)." Dissent at 10997 (emphasis added); *see also id.* at 11006-07 ("I cannot say that Kesser has adduced *clear and convincing evidence* that the challenge was purposefully discriminatory." (emphasis added)). We held in *Taylor* that § 2254(e)(1) applies to challenges based on extrinsic evidence; or "evidence presented for the first time in federal court," and requires proof by clear and convincing evidence. *Taylor*, 366 F.3d at 1000. By contrast, we apply § 2254(d)(2) to "intrinsic review of a state court's processes, or situations where petitioner challenges the state court's findings based entirely on the state record." *Id.* at 999-1000; *see also Lambert v. Blodgett*, 393 F.3d 943, 971-72 & n.19 (9th Cir. 2004). *But see Miller-El*, 125 S. Ct. at 2325 (reciting, without distinguishing, both § 2254(d)(2) and § 2254(e)(1)).

Because the evidence of the prosecutor's bias is found in the record that was before the California Court of Appeal, we are governed by § 2254(d)(2) rather than § 2254(e)(1). In any event, the question of which AEDPA standard we apply here may be academic, because the record satisfies either standard.

nation." *Batson*, 476 U.S. at 98; *see also Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam) ("If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination."). At this stage, "the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. at 768. Although the burden remains with the defendant to show purposeful discrimination, the third step of *Batson* primarily involves the trier of fact. After the prosecution puts forward a race-neutral reason, the court is required to evaluate "the persuasiveness of the justification." *Id.* To accept a prosecutor's stated nonracial reasons, the court need not agree with them. The question is not whether the stated reason represents a sound strategic judgment, but "whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion). "It is true that peremptories are often the subjects of instinct," and that "it can sometimes be hard to say what the reason is." *Miller-El*, 125 S. Ct. at 2332. "But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Id.* "While subjective factors may play a legitimate role in the exercise of challenges, reliance on such factors alone cannot overcome strong objective indicia of discrimination . . . ." *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994).

The trier of fact may not turn a blind eye to purposeful discrimination obscured by race-neutral excuses. "[T]he prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." *Batson*, 476 U.S. at 98 n.20 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981)). "A *Batson* challenge does not call for a mere exercise in thinking up any rational basis." *Miller-El*, 125 S. Ct. at 2332. Reasons must be "related to the particular case to be tried." *Batson*, 476 U.S. at 98. "[I]mplausible or fantastic justifications may (and proba-

bly will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

**[2]** The court need not accept any proffered rationale. We have recognized that "[w]hen there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." *Johnson*, 3 F.3d at 1331. The court must evaluate the record and consider each explanation within the context of the trial as a whole because " '[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.' " *Hernandez*, 500 U.S. at 363 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)); *see also Miller-El*, 125 S. Ct. at 2324 (noting that *Batson* requires inquiry into " 'the totality of the relevant facts' about a prosecutor's conduct" (quoting *Batson*, 476 U.S. at 94)); *Batson*, 476 U.S. at 93 ("In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." (internal quotation marks omitted)). A court need not find all nonracial reasons pretextual in order to find racial discrimination. "[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination." *Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003); s*ee also United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989) ("Thus, the court is left with only two acceptable bases for the challenges . . . . Although these criteria would normally be adequately 'neutral' explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency.").

III

The " 'totality of the relevant facts' " in this case includes the prosecutor's statements about his jury selection strategies and his explanations (racial and nonracial) for striking minor-

ity jurors. *Hernandez*, 500 U.S. at 363 (quoting *Davis*, 426 U.S. at 242). They also include the characteristics of people he did not challenge. "If a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise-similar [nonminority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El*, 125 S. Ct. at 2325.[2]

**[3]** The Court in *Miller-El* applied comparative juror analysis to a case originally tried in 1986, remanded for a *Batson* hearing in 1988, and appealed under AEDPA in 2000. The Court's holding means that the principles expounded in *Miller-El* were clearly established Supreme Court law for AEDPA purposes at least by the time of the last reasoned state court decision in *Miller-El*, handed down in 1992, before Kesser's 1993 trial.

**[4]** In this case, an evaluation of the voir dire transcript and juror questionnaires clearly and convincingly refutes each of the prosecutor's nonracial grounds, compelling the conclusion that his actual and only reason for striking Rindels was her race.[3]

---

[2]Long before *Miller-El*, we approved the use of comparative juror analysis. *See Lewis*, 321 F.3d at 830-33 (employing "a comparative analysis of the struck juror with empaneled jurors" in a case governed by AEDPA); *McClain v. Prunty*, 217 F.3d 1209, 1220 (9th Cir. 2000) (applying comparative juror analysis under AEDPA review and noting that the "prosecutor's motives may be revealed as pretextual where a given explanation is equally applicable to a juror of a different race who was not stricken by the exercise of a peremptory challenge"); *Turner v. Marshall*, 121 F.3d 1248, 1251-52 (9th Cir. 1997) ("A comparative analysis of jurors struck and those remaining is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination."); *Chinchilla*, 874 F.2d at 698-99 (finding pretext where the prosecution claimed it struck a Hispanic juror partly on account of his residence, but did not strike a non-Hispanic juror with the same residence).

[3]In *Miller-El*, the trial court did not conduct a comparative juror analysis on remand because it found no race-related reasons for the strike. In

**[5]** The dissent argues that a comparative juror analysis is not warranted here, because Kesser "did not press a comparative analysis at trial and developed no factual basis to support one." Dissent at 11006. This reasoning overlooks the fact that Kesser *could not* present a comparative analysis at trial. Because the trial judge did not find any race-based reasons for the challenge (*Batson*'s second step), the court did not reach the question of whether any race-neutral reasons were pretextual (*Batson*'s third step). *See Purkett*, 514 U.S. at 768 (finding that the lower court erred by "combining *Batson*'s second and third steps into one"). The "factual basis" for a comparative juror analysis is contained in the voir dire, which was submitted to the California Court of Appeal and was part of the "evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Furthermore, in *Miller-El*, the Court made clear that the comparative analysis is required even when it was not requested or attempted in the state court. The Court rejected arguments that

> conflate[d] the difference between evidence that must be presented to the state courts to be considered by federal courts in habeas proceedings and theories about that evidence. There can be no question that the transcript of *voir dire*, recording the evidence on which Miller-El bases his arguments and on which we base our result, was before the state courts, nor does the dissent contend that Miller-El did not "fairly presen[t]" his *Batson* claim to the state courts.

the case at hand, the trial court likewise conducted no comparative juror analysis because it found all of the prosecutor's reasons to be race-neutral. The state court of appeal also neglected to perform a comparative analysis, perhaps because California caselaw provided that neither the court of appeal nor the trial court need "compare the responses of rejected and accepted jurors to determine the bona fides of the justifications offered." *People v. Arias*, 13 Cal. 4th 92, 136 n.16 (1996); *see also People v. Johnson*, 47 Cal. 3d 1194, 1220-21 (1989). The California courts may wish to revisit this position in light of *Miller-El*.

*Miller-El*, 125 S. Ct. at 2326 n.2 (second alteration in original) (citations omitted); *see id.* at 2340 (concluding that the state court's conclusion that the jurors were not struck on account of race was "wrong to a clear and convincing degree[;] . . . unreasonable as well as erroneous").

We too have a transcript of voir dire and a *Batson* claim fairly presented, and that is all *Miller-El* requires. We see no significant differences that would permit us to ignore the comparative analysis prescribed there. In *Miller-El*, the original trial was completed before *Batson*; the case was remanded for a *Batson* hearing after appeal. In this case, a *Batson* inquiry was conducted immediately after the allegation of misconduct. Arguably, this case provides a *better* candidate for comparative juror analysis, because the prosecutor's recorded justifications for the strikes are contemporaneous with the voir dire. *See Turner*, 121 F.3d at 1251 (finding that "[a]lthough both the lack of a contemporaneous explanation and the prosecutor's limited recollection [were] troubling," "the transcripts of voir dire and the evidentiary hearing yield-[ed] a sufficient basis for review"). *Batson* declared that "[i]n deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent *as may be available*." 476 U.S. at 93 (emphasis added) (internal quotation marks omitted).

## IV

**[6]** The prosecutor cited Rindels's employment, her "pretentious" and "self-important" attitude, her attitude towards the criminal justice system, her family background, and her "unstable, fairly weak" personality. Devoid of context, his proffered explanation for his peremptory challenge is at least plausible. As the California Court of Appeal found, "[t]hese reasons are race-neutral." *Chiara*, No. A060502, slip op. at 19. But the prosecutor's explanation, read in the context of a "side-by-side comparison[ ]" with the background and

responses of the jurors who were seated, reveals the prosecutor's purposeful and plainly racial motives in excusing Rindels and others. *Miller-El*, 125 S. Ct. at 2325. His ostensibly "race-neutral" reasons show themselves to be only a veneer, a pleasing moss having no depth. We consider in turn each of the prosecutor's stated reasons.

A

**[7]** The trial court initially rejected Kesser's *Batson* challenge because it was based, the court believed, on Rindels's work for a tribe rather than on her status as a Native American. But a closer look at the prosecutor's statement shows that it was her association with Native American culture, rather than her employment, that rendered the "darker skinned" woman suspect in his eyes. He explained that the Native Americans who work for the tribe are troublesome because they are more likely to "associate themselves with the culture and beliefs of the tribe" instead of "our laws," and are likely to be "resistive" and "somewhat suspicious" of the justice system. The California Court of Appeal recognized and the state no longer disputes that the government's reasoning in this instance was racial. *Chiara*, No. A060502, slip op. at 19 ("Were [the prosecutor's comments quoted above] the only or primary reason given by the prosecutor, we would have some cause for concern."). The state court clearly misinterpreted the facts, however, when it found that the prosecutor's other justifications were genuine reasons for the strike.

B

**[8]** The prosecutor indicated that Rindels was "pretentious in my mind and self-important with the thought that only she could complete the necessary paperwork [for the tribe's HUD] grant." We cannot believe this was a sincere reason for striking her, since many others who were not struck also expressed concerns about leaving their work for the weeks and perhaps months needed to complete Kesser's trial. Such

excuses were commonplace; successful excuses offered at the hardship hearing included work, childcare, a fishing vacation, and even planned home repairs. One potential juror was excused simply because he had drawn deer tags for Wyoming, another (not excused) complained that jury service "kind of spoils my summer."

Several schoolteachers protested, as Rindels did, that they could not leave their work to others. Yet other jurors who held nontribal jobs were allowed to serve despite their reluctance to leave work and their claims that others could not fill their shoes. "[W]e've had an awful lot of teachers," the prosecutor himself admitted, "in fact I can't think of one teacher who didn't think they were pretty important and needed to be at their school." Nevertheless he accepted teachers on the panel, including jurors J, O, and N.[4] J considered it "imperative" that she be in her classroom—she claimed it was not possible to find a replacement who was (as she emphasized in her hand-written questionnaire) appropriately "*qualified* (having the appropriate science background and knowledge)." She argued that "[a]pproximately 180 students will be under my direction" and insisted that the beginning of the school term was a "critical time" for establishing "rules, procedures and rapport."

[9] N, also a teacher, brought up his hardship in voir dire. "I'm sure you know I'm a teacher," he explained, "[t]his would start around the time school starts." Even though juror N realized jury service was "never convenient for anybody,"

---

[4]In this comparative juror analysis, we necessarily include detailed and sensitive personal information about jurors and venire members. Where these individuals' identities have not been publicly disseminated previously, we have chosen to preserve their privacy by withholding their names. Instead, we use the letter designations associated with the jurors' voir dire questionnaires, which appear in the record as exhibits A through X to defense counsel's Declaration in Support of Petitioner Kesser's Traverse and/or Amended Petition for Habeas Corpus. The declaration and exhibits were filed with the district court on July 2, 1998.

he assumed that his work was particularly important and insisted that his hardship be considered. Juror F also wrote about her hardship: "I am about to leave for Oregon on a vacation. I consider this SERIOUS." Juror L's situation was almost identical to Rindels's. She wrote that she had "deadlines at work to meet and I'm the only one handling these specific jobs." Yet L was not struck. Juror H did not claim hardship on account of his work, but emphasized on his questionnaire that he was "HEAD custodian" and bragged that his "job duties" were to "have 20 men work for me!" In light of this evidence, the prosecution's argument that it struck Rindels because of her pretentiousness in pleading hardship cannot be taken seriously.

The prosecutor's explanation not only fails a comparative analysis, it is inconsistent with Rindels's own testimony. She did not tout her qualifications, but simply explained matter-of-factly that it would be hard for her to serve because she was "the only qualified individual at my work place to complete an application to HUD" and that the application had an impending due date. As was clear from her written questionnaire, Rindels was the office manager for a tribe and had held that job for twelve years, so it seems quite unlikely that her explanation on the hardship form was mere hubris. Such intangibles as voice inflection and body language are impossible to judge from a cold transcript, but her answers at the hardship hearing hardly sound "pretentious" or "self-important," and the prosecutor never referred to concerns about the intangibles. Unlike the teachers in the pool, she did not expound on her irreplaceability or reiterate complaints about leaving work once it was clear that the HUD application would not create a conflict. Here is the purportedly presumptuous hardship voir dire in its entirety:

The Court: You are Debra Rindels?

Ms. Rindels: Yes.

The Court: Good, a match.

Ms. Rindels, you indicate you're the only one at work that can fill out the HUD application. I want you to have in mind the only time you'd have to be here other than that would be one other appointment we are setting up for you probably in August, so have you had some time to do that, I guess?

All right, any other concerns that you had that you did not put down?

A. No.

Q. All right. We'll have you at this time go down to the jury commissioner's office . . . okay?

A. Thank you.

Although we could almost accept the state court's finding that the prosecutor's charge of self-importance was race-neutral, we cannot do so when we consider the opinion, expressed in his outburst during the *Batson* hearing, that Native American institutions are given more influence than they should be. The prosecutor dismissed the grant as "very important I guess to her"—a gratuitous comment applicable to any person contemplating the inconvenience of missing work or forgoing other opportunities to serve on a jury—without considering the fact that the HUD application was likely very important to the tribe because it would provide housing for four families. Rindels's statements indicated that she took her responsibilities seriously and appreciated the importance of her work; they did not show self-importance.

[10] Even if the prosecutor could establish that Rindels was unusually pretentious about her work, he offered no explanation about how this would render her unsuitable for the jury. He did not show how the finding was "related to the particular case to be tried." *Batson*, 476 U.S. at 98. Although he claimed to be concerned about Rindels's attitude, he did not ask her

further questions about her work or her interpersonal experiences. For a *Batson* inquiry, we require more than this. "[U]nless he had an ulterior reason for keeping [Rindels] off the jury we think he would have proceeded differently. . . . [W]e expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike." *Miller-El*, 125 S.Ct. at 2327. The prosecutor asked Rindels no questions at all.

C

**[11]** The prosecutor observed that Rindels was "misty" and "emotional about the system" because she "teared up" when talking about her daughter's molestation. This rationale is so underdeveloped that it likely falls short of *Batson*'s mandate for a " 'clear and reasonably specific' explanation of [the] 'legitimate reasons' for exercising the challenges." *Batson*, 476 U.S. at 98 n.20. The prosecutor did not explain how "misty[ness]" might interfere with Rindels's performance as a juror in this particular case. It seems likely that if any show of emotion were the real reason for challenge, he could have explained why. He knew how to make this kind of an argument when it really mattered. When he challenged another venirewoman for cause, he explained that "the depth of her feelings probably will not be recorded by the reporter, but there was significant bitterness in her voice when she talked about both [the] Federal Bureau of Investigation and . . . the district attorney's office." He made no such observations about Rindels.

It is difficult to see how the prosecutor can support his "emotional" justification on this record. The record does not indicate whether Rindels was emotional about "the system" or about her daughter's ordeal—or in fact whether she showed any emotion at all. It does show that she felt comfortable with a system that had prosecuted and incarcerated her father for the offense. When she was asked if she was "satisfied with [the] conclusion" of the proceedings, she answered "Yes." On

her questionnaire, she also answered that she was satisfied with the response of the police, the district attorney, and the court system. Her testimony about the molestation reveals no dashes, interruptions, or false starts to indicate that she had difficulty talking about the incident.

While Rindels voiced no feelings about the system (other than her overall satisfaction with the handling of her daughter's case), other jurors did express negative feelings and anxiety about the system—and they were nevertheless retained. Juror E testified that her mother-in-law was killed by a drunk driver who was not adequately punished. She told the judge that "the drunk driver got off with a hand being slapped and nothing ever happened to him." E also explained that her son was cited for a "California stop" and that she "didn't really think this was fair," even though it was "within the law." Juror E's previous experience as a juror also seemed to leave a bad taste in her mouth. The whole incident was "confus-[ing]" because "all the testimony and everything seemed that he was guilty" but "the way the law was stated . . . of course there was reasonable doubt because none of us saw [the crime]."

Juror E expressed unhappiness with the system from every vantage point. Whether she found herself or a family member a victim, an offender, or juror, she was dissatisfied. Juror F also harbored resentment because of her previous experience as a juror. In a criminal battery case, she complained the prosecutor "couldn't marshal enough evidence to even entertain us." She saw the whole thing as "a big waste of time" that "seemed like kind of a vendetta" or "a circus." Juror H had a very different emotional response to jury service; he admitted that he found the prospect of serving as a juror terrifying. He explained his anxiety in voir dire by saying "when I filled that [questionnaire] out I was pretty nervous—I'm nervous just right now, I feel like I'm the guilty person up here right now." Although none of these jurors expressed very strong

emotions about "the system," the comparison reveals that Rindels's emotional response was among the weakest.

**[12]** The evidence shows that Rindels was not emotional about, resistive to, or suspicious of the system. She was a law-abiding citizen who favored a criminal system that was active in the community. She had never been arrested or even received a traffic citation. In fact, Rindels seems a better juror for the prosecution than others who were accepted despite minor run-ins with the law that might foster resentment. Juror K had been arrested for drunk driving (and had served on a hung jury in a drunk driving case), and Juror G had been haled into court for child support.

## D

The prosecutor also claimed that Rindels was living in a dysfunctional family because of her daughter's abuse. "Her daughter had been molested by her father," he explained, "and for that reason I'm assuming that the living situation was indicative of something of a dysfunctional family." Rindels's own testimony contradicts the assumption that she was living in a dysfunctional family. When asked whether the perpetrator was "within the family unit," she replied, "No, not in our immediate family. It was my father." She was not living with a child molester, and she clearly did not condone the perpetrator's behavior. When asked if she approved of the crime's resolution (her father was given jail time and probation), she said, "Yes." Perhaps the prosecutor assumed that her family was dysfunctional because it contained a victim of childhood sexual abuse. He may have jumped to the conclusion that hers was one of the Native American families that accepted child molestation as "okay." The record suggests, however, that the experience had strengthened Rindels's family. She explained that she had strong feelings about drugs and alcohol "in a household that involves children." "I believe in strong family values," she explained, "we've been the victims, and maybe that's why." Rindels's position as a crime victim and her

belief in family values would seem to make her a good prospective juror for the prosecution, yet the prosecutor did not ask her about her family history or her values. As in *Miller-El*, "the prosecution asked nothing further about the influence [her family] history might have had on [Rindels], as it probably would have done if the family history had actually mattered." 125 S. Ct. at 2328.

**[13]** It is difficult to believe that Rindels's family background provided a real reason for striking her because the prosecutor accepted several other jurors with family problems. Juror G had been married, divorced, remarried, and then separated. He had also "been in court on child support." Juror E complained of several family issues, including a stressful divorce between her parents, alcohol use, drug use, drug dealing, criminal charges, and compulsive lying. While Rindels had been married for fourteen years, juror L was still going through an "emotional and unpleasant" separation of five and one-half months. At voir dire, L described additional family problems that plagued her youth; her mother was abused by her stepfather while she was living at home. She remembered seeing marks on her mother's body and explained that the abuse was discovered because her mother's injuries required hospital treatment. When the judge asked if L had "strong feelings" about the incident, she had trouble putting her emotions into words:

A. Well, I think it's wrong.

Q. Sure.

A. And it was my mother, but I—nothing—nothing more than, you know, anyone else would do about it, I guess I would feel about it, I guess. [TT 2578]

The prosecutor did not excuse other jurors whose relatives, like Rindels's father, had committed crimes. Alternate juror Q had a brother who was jailed for a fight with a policeman,

juror F's husband was arrested for drunk driving, and alternate juror X's son had trouble with the law and with drinking. X explained he "would have liked to change my son's [life], but it didn't work." The prosecutor also retained jurors whose relatives, like Rindels's daughter, had been victims of a crime. It is true that there was no admitted juror whose family situation matched hers exactly, but the law does not require such a finding. "A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable . . . ." *Miller-El*, 125 S. Ct. at 2329 n.6.

**[14]** Because the prosecutor accepted these jurors and rejected Rindels, his use of family background as a decisive factor is almost certainly pretextual. The Court rejected a similar challenge in *Miller-El*, where the prosecution relied on crime in an African American juror's family to justify a strike where the relative's "criminal history was comparable to those of relatives of other panel members not struck by prosecutors." *Id.* at 2331 n.8. The prosecutor's prejudices about Native American home life may have helped him overlook Rindels's affirmation of family values, her stalwart approval of criminal justice even when it was meted out against her own father, and the prosecutor's own observation that Rindels was, like any mother might be, "a bit emotional and misty" about, and not "okay" with, the misfortune that had befallen her daughter.

Even if he could show that Rindels's living situation was more dysfunctional than other jurors', the prosecutor did not explain how her family situation might impact the case at hand. In fact, family background does not seem to have been a consideration in his overall challenge strategy. When defense counsel made a motion to challenge one venire-woman because of "her personal background" and her "emotional involvement in her own child's divorce," the prosecutor attempted to rehabilitate the potential juror. Her situation was much like Rindels's. Her daughter suffered physical and emo-

tional abuse, and the woman still had strong feelings about the situation. "I saw my daughter go through some bad things," she explained. Unlike Rindels, this woman could not be sure that the experience would not affect her judgment and impartiality. The prosecutor objected to the challenge for cause, denying that there was "going to be significant evidence of abuse" introduced in the case. "[W]e are not going to get into the kind of thing that affects her," he argued. This woman (whose race is not in the record) was "the kind of juror we need."

In light of this exchange, it seems that experience with domestic violence and abuse was not a liability, at least in the prosecutor's view. In fact, he might have found this woman a good juror precisely *because* she was the mother of a vulnerable daughter who, like Kesser's ex-wife, had fallen victim to abuse.

E

Finally, the prosecutor argued that Rindels was "unstable, fairly weak, and somebody who I thought would be easily swayed by the defense." These are conclusions about Rindels's unsuitability, rather than reasons for it, and the prosecutor did not explain how he arrived at these conclusions. I will briefly evaluate them, though they fall far short of being " 'clear and reasonably specific' explanation[s]" for the challenges. *Batson*, 476 U.S. at 98 n.20; *see also Burks*, 27 F.3d at 1429 ("We do not hold that a party's explanation for the exercise of peremptory challenges will be insulated from appellate review so long as it is couched in vague and subjective terms.").

[15] These conclusions are inconsistent. They contradict the prosecutor's earlier assertion that Rindels was "pretentious" and "self-important." The alleged instability and weakness are also contradicted by Rindels's own testimony that her experience with abuse had strengthened her family and her

sense of justice. The prosecutor explained at the *Batson* hearing that he sought jurors "who can judge someone else and who [are] strong enough to make a decision and return a verdict of guilty." Rindels affirmed that she "believe[d] in strong family values" because her family had experienced criminal abuse.

As I explained above, the prosecutor accepted jurors who showed emotional discomfort and even fear during voir dire. If juror L's halting testimony about her mother's abuse and juror H's nervous confession that he "fe[lt] like [he was] the guilty person" are not signs of unacceptable weakness, it is hard to believe that Rindels's "misty" reaction to her daughter's sexual abuse was.

Rindels's reported satisfaction with a criminal prosecution in her family undercuts the prosecutor's argument that she would have been "easily swayed by the defense," that she distrusted the courts, or that she retained a bias for defense attorneys. The prosecutor accepted jurors who were more vulnerable to a persuasive defense argument. Jurors E and F had each been swayed by defense lawyers in previous criminal cases: E because it was "his word against hers" and F because the prosecutor "couldn't marshal enough evidence to even entertain us." These women seem like far better candidates for a prosecution peremptory strike.

**[16]** In light of the record, the prosecutor's facially plausible explanations are "severely undercut by the prosecution's failure to object to other panel members who expressed views much like [Rindels's]." *Miller-El*, 125 S. Ct. at 2329. "The fact that [a given] reason also applied to these other panel members, most of them white, none of them struck, is evidence of pretext." *Id.* at 2330. The evidence in the record here "is open to judgment calls, but when this evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination." *Id.* at 2339. As in *Miller-El*, the record not only shows that at least one indi-

vidual juror was struck on account of race, it contains evidence of pervasive racial animus. In *Miller-El*, there was evidence that court procedure permitted the prosecution to "shuffle" juror cards to keep black jurors from being drawn, and the record suggested that prosecutors' handbooks used in the jurisdiction recommended racial strikes. *Id.* at 2333, 2338-39. In Kesser's case, we have more direct evidence of racially motivated selection; the prosecutor himself admitted that he found Native Americans "resistive of the criminal justice system generally," and that he believed Native American institutions allowed tribal members to violate "our laws" with impunity.[5]

Neither the discriminatory shuffle and jury selection manuals in *Miller-El* nor the racist comments here are required for a successful *Batson* challenge, and these factors alone will not succeed unless accompanied by a showing that nonracial justifications for striking a minority juror are pretextual. The prosecutor's remarks, however, do much to bolster Kesser's claim. They underscore the necessity of applying a comparative juror analysis in order to bring his purported justifications under greater scrutiny. We have previously found that "factors [that] may have been relevant in negating a 'pattern' of discrimination in the jury selection" are "not persuasive in the face of the prosecutor's statements expressly admitting a discriminatory motive." *United States v. Omoruyi*, 7 F.3d 880, 882 (9th Cir. 1993) (finding that where the government admit-

---

[5]There is another evidentiary difference between this case and *Miller-El*. Because that case involved the death penalty, it had a large venire panel and consequently a fairly large class of excluded minorities—African Americans. This case involves a smaller minority, Native Americans. Where ten out of eleven African Americans were struck in *Miller-El*, three out of three Native Americans were struck in the case at hand. Because Native Americans are a small minority class, strikes against them, when considered against the complete venire, will rarely be as statistically significant as those against African Americans. The comparative juror analysis in *Miller-El* allows us to protect even small classes of minorities because it evaluates individual strikes instead of mere statistics.

ted to a strategy of striking unmarried women but not unmarried men, inclusion of six women on the panel did not prevent a finding of discrimination). As we have observed, "The stronger the objective evidence of discrimination, the more we will require by way of verifiable facts to sustain a trial court's finding upholding the exercise of challenges." *Burks*, 27 F.3d at 1429-30.

**[17]** On the basis of the record, we find the California Court of Appeal's conclusion that the prosecutor did not strike Rindels because she was Native American to be wrong, and unreasonably so. *See* 28 U.S.C. § 2254(d)(2). Indeed, we think the record so strong on this point that it cannot admit any other conclusion, and even satisfies the more demanding standard of "rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1). *See supra* at 10957 n.1.

V

**[18]** Although the evidence for a race-based strike of Rindels is overwhelming, we do not rely exclusively on her case alone. The evidence of the prosecutor's racial animus is most obvious with respect to Rindels, but it is also consistent with his treatment of the other two Native Americans and other minorities on the venire. At the *Batson* hearing, the prosecutor also gave his reasons for striking potential alternate jurors Nakata (who was identified as possibly being Filipina) and Native Americans Lawton and Smithfield.[6] Along with Rin-

---

[6]A *Batson* challenge to the prosecutor's removal of Nakata is not before us. The trial court did not find that a prima facie case of racial or ethnic bias had been made in her case, and in any case the claim is unexhausted as Kesser's petition for review in the California Supreme Court failed to raise the issue. Nevertheless, at least some of his testimony about Nakata is relevant here, because it indicates possible racial animus and so lends support to Kesser's argument that the prosecutor employed racial stereotypes throughout the jury selection. He explained that he "couldn't tell

dels, the prosecutor noted, these were "the darkest skinned women that I saw on the panel."

Because just one racial strike calls for a retrial, we will not determine here whether there was any genuine nonracial reason for striking each of these jurors. These cases are not as clear-cut as Rindels's. The record indicates that there may have been genuine race-neutral reasons for striking Lawton, Smithfield, and Nakata. It is important to note, however, that the prosecutor offered several pretextual explanations for these strikes, and this undercuts his credibility. As we noted in a similar case, "the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency." *Chinchilla*, 874 F.2d at 699; *see also Burks*, 27 F.3d at 1429 ("*Chinchilla* was thus a case where two of the three explanations offered by the prosecutor were objectively and demonstrably false. Where, in such a case, defendant shows the remaining race-neutral reason is not sufficiently 'clear and reasonably specific,' he may be deemed to have carried his burden of proving intentional discrimination on the basis of race."). The prosecutor's willingness to make up nonracial reasons for striking Lawton, Smithfield, and Nakata makes it even harder to believe that his reasons for striking Rindels were race-neutral.

---

whether she was an [E]ast [I]ndian, a Chican[a], or a [F]ilipin[a]." He did not consider Nakata to be Native American, "but she was in fact brown skinned." Although Nakata did not testify about her relationship with her husband, the prosecutor was convinced that "she was somewhat insecure and she impressed me as a woman who would walk two steps to the left and one to the rear. I think that she would put up with a great deal from her husband." In particular, the prosecutor's reference to Nakata walking "two steps to the left and one to the rear" smacks of racial and ethnic stereotypes of the subservient Asian woman. *See* Peter Kwan, *Invention, Inversion and Intervention: The Oriental Woman in* The World of Suzie Wong*, M. Butterfly*, and The Adventures of Priscilla, Queen of the Desert, 5 ASIAN L.J. 99, 100 (1998) ("The Oriental Woman is meek, shy, passive, childlike, innocent and naïve. She relies and is dependent on the white hero . . . .").

A

The prosecutor excused Lawton because she was married to a man who had to pay child support; she had a speeding ticket (not multiple "speed tickets," as the prosecutor claimed) and a drunk driving arrest; she followed a murder trial in which Kesser's attorney secured an acquittal; she had a long commute and the prosecutor feared snow might cause delays; and she was "weak," "not overly educated," and said she would have trouble answering out loud if the jury was polled.

The prosecutor's first reason appears to be a good one at first glance. Lawton might sympathize with Kesser, who grew angry with his victim after the government garnished his wages for child support. The state court of appeal found this a "solid" reason for a strike, *Chiara*, No. A060502, slip op. at 21, but the court did not address the real issue: Was the reason a genuine one? If the prosecutor was really worried about resentment over support, he certainly would have challenged juror G, who had first-hand experience with court-ordered child support. G had been called into court "on child support," and the ordeal left him dissatisfied. Unhappy about and "surprised" by "how much the law leaned toward the women," G took a class in family law to learn "where the law leaned for me." Despite the juror's open expression of dissatisfaction with the same legal processes that allegedly motivated Kesser to kill his wife, the prosecutor did not even bother to ask G any questions.

Although the prosecutor characterized Lawton as "someone who was involved in the criminal justice [system]" because of her traffic violations, he admitted other jurors with tickets, including alternate juror S, who got a traffic ticket and went to traffic school, and alternate juror W, who admitted to having "moving violations." Juror G confessed that he had been stopped for speeding, received an unspecified number of tickets and warnings, and been required to appear in court for child support problems that were "my fault." Juror K had, like

Lawton, been convicted of DUI. It seems unlikely that Lawton's minor violations had soured her opinion of the police or made her sympathetic to criminals. She had a policeman in the family; her brother-in-law was a highway patrolman.

Lawton had read about a murder case Kesser's attorney had argued, but there is no evidence she was aware of his role in the case. She indicated (at voir dire and in her questionnaire) that she did not know the lawyer and that she had never met any attorneys involved in the murder case. In contrast, juror F reported she actually *knew* Kesser's counsel, and explained that he handled a child custody case for her husband. Nevertheless, the prosecutor left her on the panel.

Reviving the epithet he applied to Rindels, the prosecutor found Lawton "weak." He worried that she would have difficulty speaking out loud if polled. While Lawton did express fears about speaking out loud in open court, so did juror H, who was so nervous he had trouble answering questions at voir dire. And H, like Lawton, was "not overly educated," having achieved only a high school education. In fact, jurors E, I, and P, as well as alternate jurors R, V, and X, were only high school graduates. Alternate jurors T and W did not advance past the tenth grade. The panel the prosecutor helped to construct shows he was comfortable with non-Indians who were "not overly educated."

One of the prosecutor's reasons, however, does check out. He was worried that Lawton's commute (some forty miles) might be hazardous in winter and cause delays. Although the record does not reveal the residences of all the jurors and potential jurors, available residences are all closer to the courthouse in Eureka. So, of the prosecutor's five given reasons for striking Lawton, one does ring true—the length of her commute—but if that was all the prosecutor had, it sounds pretty hollow.

B

Because Smithfield's husband was a recovered alcoholic, the prosecutor said he feared she might sympathize with the defendants. This seems to be a logical, case-specific reason, because Kesser and Leahy were recovering alcoholics who met in a treatment program. The state court found it a "powerful" reason. *Chiara*, No. A060502, slip op. at 20. In light of the comparative juror analysis, however, it does not appear to be a genuine one. The prosecutor did not excuse juror K, who had *personally* experienced problems leading to a DUI conviction. Other jurors, like Smithfield, had close contact with alcoholism sufferers and might sympathize with Kesser. Juror F's husband had been arrested for drunk driving, juror P's sister was a recovered alcoholic, and alternate juror X had an alcoholic son. Another alternate juror, S, worked as a nurse in "detox" and reported that working with alcoholics "has given [her] a more open mind" towards victims of alcoholism. Juror E admitted "there's alcoholism in—in our family and . . . it turns out drugs too, because my—I have a relative who is now on charges for drug selling."

In addition to her husband's condition, the prosecutor claimed he struck Smithfield because she was worried about leaving her job as a preschool teacher. He claimed, without further corroboration, that she was "the sole support for her family." Smithfield wrote a letter to the judge expressing her concerns, and the prosecutor worried she was "overly concerned" about her work. The record does not show that Smithfield's feelings were unusual. As noted earlier, several schoolteachers on the panel complained that they could not adequately be replaced. Jurors J, N and O, all teachers, expressed concerns like Smithfield's. The prosecutor himself acknowledged that "teachers on the panel" all felt that they "needed to be at their school[s]." Additionally, Smithfield would have been paid during jury service, so any fear that her family's "sole support" would fail were unfounded. She did bring up her hardship concerns outside the hardship hearing—

putting them in a letter—but so did juror N, who broached the subject in voir dire.

Lastly, Smithfield had an uncle who was a fraud investigator and some cousins on the Los Angeles police force. Because of her connections to law enforcement, it seems likely she would be a strong prosecution juror.

VI

Although we must give deference to the California Court of Appeal's findings of fact, that court ruled on the credibility of the prosecutor's reasons without citing to any material from the voluminous voir dire. Indeed, the court referred only to the prosecutor's own reasoning as presented in the *Batson* hearing. It is hardly surprising, then, that the court failed to notice that his reasons were "sham excuse[s]" unsupported by the stricken jurors' testimony and that his purported justifications were plainly inconsistent with his other challenges. Taken as a whole, the record reveals that all of the prosecutor's nonracial reasons for striking Rindels and most of his nonracial reasons for striking the other "darkest skinned women" from the panel were pretextual. We are compelled by the Supreme Court's holdings in *Batson* and *Miller-El* to rectify this unreasonable misevaluation of the record. We cannot deny Kesser a representative jury by turning a blind eye to the prosecutor's pretextual, make-weight justifications for his race-based strikes. Under *Batson*'s third step, state courts must review the record to root out such deceptions. In this case, the state court's own findings are unreasonable in light of the record before it. We grant the writ.

The judgment of the district court is reversed and the case is remanded with instructions to grant the writ.

REVERSED and REMANDED.

**Volume 2 of 2**

WARDLAW, Circuit Judge, with whom PAEZ and BER-ZON, Circuit Judges, join, concurring:

I join in the majority's well-reasoned opinion; the trial court abdicated its duty under *Batson v. Kentucky*, 476 U.S. 79 (1986), to determine pretext, with particularly egregious results here, in the face of raw prosecutorial bias against Native Americans. I write separately to note my view that inherent in the Supreme Court's equal protection jurisprudence, which spawned *Batson* and its progeny, the central question is whether the challenged decision was made with a racially discriminatory purpose. *Washington v. Davis*, 426 U.S. 229, 239 (1976). Where a prosecutor articulates both race-based and race-neutral reasons for striking a veniremember, Supreme Court precedent requires application of "but for" mixed-motive analysis to determine whether the strike violates the Equal Protection Clause. I would therefore grant habeas relief on the alternative ground that the California Court of Appeal's failure to apply mixed-motive analysis was an unreasonable application of clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).

# I

The Supreme Court has created a generic framework for determining whether a decision ostensibly resulting from a race neutral purpose in fact resulted from a racially discriminatory purpose. Under this single-motive or pretext approach, the alleged victim of discrimination must make out a prima facie case of discrimination; the perpetrator must offer a non-discriminatory explanation for the decision; and the victim must then demonstrate that the explanation is pretextual, *i.e.*, that the decision was in fact motivated by a discriminatory purpose. *See, e.g.*, *Batson*, 476 U.S. at 96-98 (peremptory challenge claim); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (employment discrimination claim). Throughout, the ultimate burden of persuasion never shifts

from the party alleging discrimination. *Burdine*, 450 U.S. at 253.

However, where both race-based and race-neutral reasons have motivated a challenged decision, a supplementary analysis applies. In these situations, the Court allows those accused of unlawful discrimination to prevail, despite clear evidence of racially discriminatory motivation, if they can show that the challenged decision would have been made even absent the impermissible motivation, or, put another way, that the discriminatory motivation was not a "but for" cause of the challenged decision. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 n.21 (1977). This dual- or mixed-motive analysis is not inconsistent with the approach used in single-motive cases, but rather supplements it where mixed motives exist. *See Desert Palace, Inc. v. Costa*, 299 F.3d 838, 857 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003).

*Batson* is an Equal Protection Clause case, which emerged from and explicitly located itself within equal protection jurisprudence. *See Batson*, 476 U.S. at 90 (equating jury discrimination cases with "any case alleging a violation of the Equal Protection Clause"); *see also id.* at 93-95 & n.18 (quoting *Davis*, 426 U.S. at 240, and *Arlington Heights*, 429 U.S. at 266); *id.* at 98 & nn.20-21 (quoting *Burdine*, 450 U.S. at 258). *Batson*'s three-step framework for evaluating claims of racial discrimination in the exercise of peremptory challenges tracks that used in other contexts to determine whether a decision was impermissibly motivated by race:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must deter-

mine whether the defendant has shown purposeful discrimination.

*Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003) (citing *Batson*, 476 U.S. at 96-98); *cf. Burdine*, 450 U.S. at 252-53 (three-step framework for employment discrimination claims). Moreover, the purpose of *Batson*'s framework is identical to that of the generic equal protection and anti-discrimination framework: to determine whether a decision was made "on account of" an impermissible basis, such as race. *Batson*, 476 U.S. at 96.

Perhaps because rare will be a prosecutorial admission at step two of the *Batson* inquiry that a challenge was race-based, the Supreme Court has yet to have occasion to apply mixed-motive analysis specifically in the *Batson* context. But that does not mean that the Court's use of mixed-motive analysis in other discrimination cases does not control the analysis here. The Court has consistently and repeatedly applied mixed-motive analysis where both permissible and impermissible motivations are present. *See, e.g.*, *Desert Palace*, 539 U.S. at 94-95 (Title VII claim); *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983) (National Labor Relations Act claim), *overruled in part by Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994); *Mt. Healthy*, 429 U.S. at 287 (Equal Protection Clause claim).

Where, as here, a decisionmaker provides both race-based and race-neutral reasons for a decision challenged under the Equal Protection Clause, clearly established federal law requires the decisionmaker to show that he would have made the decision even in the absence of any racially discriminatory motivation. *See, e.g.*, *Mt. Healthy*, 429 U.S. at 287. In *Batson* cases, courts may apply mixed-motive analysis at step two, and hold that a prosecutor who cannot show that he would have struck the veniremember in question absent the admitted racially discriminatory motivation has failed "to explain adequately the racial exclusion" by demonstrating that "permissi-

ble racially neutral selection criteria and procedures" justified the strike. *Batson*, 476 U.S. at 94 (internal quotation marks omitted). Alternatively, courts may apply mixed-motive analysis at step three, where a defendant will succeed in establishing purposeful discrimination if the prosecutor cannot demonstrate that he would have exercised the strike absent his discriminatory motive. *See id.* at 98. Either way, a court may not allow a mixed-motive rationale to survive equal protection scrutiny unless the prosecutor can establish by a preponderance of the evidence that he would have reached the same decision even in the absence of impermissible race-based motivation. *See Mt. Healthy*, 429 U.S. at 287.

Every one of our sister circuits to have decided *Batson* cases in which mixed motives are present has come to this conclusion. *See Howard v. Senkowski*, 986 F.2d 24, 27-30 (2d Cir. 1993) (remanding for correct application of mixed-motive analysis on habeas review); *Gattis v. Snyder*, 278 F.3d 222, 232-35 (3d Cir. 2002) (approving correct application of mixed-motive analysis on habeas review); *Jones v. Plaster*, 57 F.3d 417, 420-22 (4th Cir. 1995) (remanding for correct application of mixed-motive analysis on direct review); *United States v. Darden*, 70 F.3d 1507, 1530-32 (8th Cir. 1995) (approving correct application of mixed-motive analysis on direct review); *Wallace v. Morrison*, 87 F.3d 1271, 1274-75 (11th Cir. 1996) (per curiam) (approving correct application of mixed-motive analysis on habeas review). The decisions of other federal courts "may be persuasive authority for purposes of determining whether a particular state court decision is an unreasonable application of Supreme Court law," particularly where the convergent holdings of several of our sister circuits reflect and apply clearly established federal law. *Robinson v. Ignacio*, 360 F.3d 1044, 1057 (9th Cir. 2004) (internal quotation marks omitted). As the Second Circuit explained in *Howard*, *Batson* requires the application of mixed-motive analysis when mixed motives are present,

> [s]ince dual motivation analysis was explicitly invoked by the Supreme Court in the context of

determining racial motivation for purposes of adjudicating a challenge under the Equal Protection Clause, *see Arlington Heights*, 429 U.S. at 270 n.21, and since *Batson* equated jury discrimination claims with "any case alleging a violation of the Equal Protection Clause," *Batson*, 476 U.S. at 90 . . . .

. . . .

. . . In concluding that dual motivation analysis applies to a *Batson* challenge, we do no more than apply that analysis precisely as previously enunciated by the Supreme Court in prior dual motivation cases such as *Arlington Heights* and *Price Waterhouse.*

*Howard*, 986 F.2d at 28, 30.

*Purkett v. Elem* is not to the contrary, notwithstanding its statement that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." 514 U.S. 765, 768 (1995) (per curiam). *Purkett* was not a mixed-motive case (the prosecutor offered only race-neutral reasons for his strikes), and there is no indication that the Court considered a situation in which a prosecutor proffers both race-based and race-neutral reasons at step two of the *Batson* inquiry.

*Purkett* addressed the Eighth Circuit's decision to evaluate and reject the prosecutor's facially race-neutral (though implausible) justifications at step two of the *Batson* inquiry, rather than to proceed to step three to evaluate the persuasiveness of the defendant's claim. 514 U.S. at 767. In reversing the Eighth Circuit, *Purkett* held that even implausible justifications for challenged strikes satisfy the prosecutor's burden at step two, so long as those justifications are race-neutral. *Id.* at 769; *see also Rice v. Collins*, 126 S. Ct. 969, 974 (2006) ("[S]o long as the reason is not inherently discriminatory, it

suffices." (citing *Purkett*, 514 U.S. at 767-68)). That "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the [victim of the alleged discrimination]" in single-motive *Batson* cases, *Purkett*, 514 U.S. at 768 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)), just as in single-motive equal protection or Title VII cases, *see Hicks*, 509 U.S. at 511, does not alter the fact that mixed-motive analysis must be used when prosecutors or civil rights defendants offer racially motivated justifications for their conduct in *Batson* cases, *see Plaster*, 57 F.3d at 420-22, just as in equal protection or Title VII cases, *see Desert Palace*, 539 U.S. at 94-95; *Arlington Heights*, 429 U.S. at 270 n.21. There is no support for the dissent's assertion that *Purkett* somehow excepted *Batson* from the Supreme Court's equal protection jurisprudence and held that mixed-motive analysis is not appropriate when a prosecutor provides racially discriminatory reasons at step two. *See Plaster*, 57 F.3d at 420-22 (citing *Purkett* and holding that mixed-motive analysis is required in *Batson* cases).

Here, neither the state trial court nor the California Court of Appeal applied mixed-motive analysis to the prosecutor's strikes of Native American venirewomen, despite the prosecutor's avowed racially discriminatory motive for striking Rindels. In light of the Supreme Court's unwavering application of mixed-motive analysis in evaluating whether a mixed-motive decision is lawful, and considering *Batson*'s place in the Supreme Court's equal protection jurisprudence, this failure to apply mixed-motive analysis constituted an "unreasonabl[e] refus[al]" to extend clearly established federal law, as determined by the Supreme Court, to a context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000).

## II

The Supreme Court's equal protection jurisprudence required the California Court of Appeal not only to apply mixed-motive analysis, but to apply that analysis correctly. It

did neither. For two reasons, and contrary to the State's assertion, the Court of Appeal's statement that "the trial court could reasonably have found . . . that the prosecutor's 'predominant motive' in excluding juror Rindels was not ethnic or racial bias" does not constitute a proper application of mixed-motive analysis.

Imagine a prosecutor considering using a strike against either an African-American or a white venirewoman because each has a spouse who has served time in prison. Imagine that the prosecutor ultimately strikes the African-American woman instead of the white woman because of her race. Although the stricken venirewoman's experience with the criminal justice system is the predominant motive driving the strike, her race is the but-for cause. Thus a partially race-based strike may pass the Court of Appeal's "predominant motive" standard but fail mixed-motive analysis. Moreover, mixed-motive analysis shifts the burden to the prosecutor to demonstrate that veniremembers would have been challenged irrespective of their race, and there is no indication that the Court of Appeal shifted the burden here.

More fundamentally, it is questionable whether the state courts even made a third-step *Batson* finding in this case. After the prosecutor, Dikeman, offered his reasons for striking all three Native American venirewomen, the trial court stated that

> there is sufficient justification to support the peremptory challenges. With regard to Miss Rindels, my understanding of what Mr. Dikeman said is that— one of them is at least that she worked for the tribe, not because she was one of the tribe, but she worked for the tribe. That's entirely different . . . .

The trial court thus interpreted the comments regarding Rindels's employment to be race-neutral, an interpretation the Court of Appeal recognized was unquestionably erroneous.

Because the trial court misinterpreted the prosecutor's prof-fered reasons, it could not have found that the prosecutor's race-neutral motivations predominated over his race-based motivations; all the trial court saw were race-neutral motiva-tions.

Nor is it clear that the Court of Appeal made a predominant motive finding in approving the trial court's *Batson* analysis. The Court of Appeal merely stated that "the trial court *could reasonably have found* . . . that the prosecutor's 'predominant motive' in excluding juror Rindels was not ethnic or racial bias." (Emphasis added.) But because the trial court did not make a predominant motive finding, the Court of Appeal's statement that the trial court "could reasonably have" made such a finding is unhelpful in determining whether the trial court in fact made that finding. Notwithstanding the dissent's attempt to conjure up a state court finding of fact to which it seeks to defer, neither the trial court nor the Court of Appeal ever weighed the prosecutor's race-based and race-neutral reasons and determined that the prosecutor's motive in strik-ing Rindels was "predominantly" race-neutral. Thus, it does not appear that there is any true finding of fact for us to review. The appropriate remedy would be to remand to the state court so that it may correctly apply *Batson* in the first instance.

Were we to remand, I would require the state court to apply mixed-motive analysis to the prosecutor's strike of each of the three Native American venirewomen, not just to his strike of Rindels. Although the prosecutor launched his anti-Native-American tirade in explaining his strike of Rindels, his con-tempt for and stark prejudice against Native Americans could not have been limited only to Rindels. Yet the Court of Appeal cursorily reviewed the strikes of Native American venirewomen Lawton and Smithfield without mentioning the prosecutor's racial bias. The Court of Appeal credited the prosecutor's explanation that he struck Lawton for a number of reasons, including the fact that she was "weak" and "not

overly educated," and that he struck Smithfield because her husband was a recovering alcoholic, like the defendants. This falls far short of the required mixed-motive analysis.

## III

For these reasons, I would hold that the California Court of Appeal's failure to apply mixed-motive analysis was an unreasonable application of clearly established federal law, as determined by the Supreme Court, and grant Kesser's habeas petition under 28 U.S.C. § 2254(d)(1).

BERZON, Circuit Judge, concurring:

I join in the majority opinion and Judge Wardlaw's persuasive concurrence. I add, however, the following observations: Because this case arises as a petition for a writ of habeas corpus, we cannot and do not address directly the constitutional standard properly applicable at the second stage of the inquiry under *Batson v. Kentucky*, 476 U.S. 79 (1986). Instead, we are restricted to deciding whether the state court decision is contrary to, or involved an unreasonable application of, "clearly established" Supreme Court law. 28 U.S.C. § 2254(d)(1). I agree with Judge Wardlaw that it is at least true that, under "clearly established" Supreme Court law, the *Batson* standard is *no less* protective of racial equality than the standard applied in Equal Protection Clause cases generally.

There is, however, a strong argument that the *Batson* standard should be *stricter* than the one Judge Wardlaw ably explicates as generally embedded in Equal Protection Clause cases. *See Wilkerson v. Texas*, 493 U.S. 924 (1989) (Marshall, J., dissenting from denial of certiorari). In a case arising on direct appeal rather than on habeas, I might well hold, as the dissenters in *Wilkerson* suggested, that in *Batson* cases, the Equal Protection Clause forbids a prosecutor from exercising

a peremptory challenge to dismiss a juror whenever a moti-
vating factor for the dismissal is race-based, without permit-
ting the prosecutor to establish that he would have challenged
the juror absent the race-based motive.

RYMER, Circuit Judge, with whom O'SCANNLAIN,
KLEINFELD, CALLAHAN, and BEA, Circuit Judges, join,
dissenting:

The prosecutor at Richard Kesser's 1995 trial in California
state court exercised a peremptory challenge based in part on
a prospective juror's Native American ethnicity and later
struck two Native American alternates. The trial court
rejected Kesser's *Wheeler/Batson* objection[1] and the Califor-
nia Court of Appeal affirmed his conviction, finding that the
prospective juror's race was not the only or primary reason
for the challenge and that the race-neutral reasons given by
the prosecutor were not a pretext for group bias. Kesser peti-
tioned for a writ of habeas corpus pursuant to 28 U.S.C.
§ 2254 on the ground that the peremptory challenge violated
the Equal Protection Clause of the Fourteenth Amendment.
The district court denied the petition under the deferential

[1]*People v. Wheeler*, 22 Cal. 3d 258 (1978), is the California counterpart
to *Batson v. Kentucky*, 476 U.S. 89 (1996), which held that purposeful dis-
crimination in the jury selection process violates the Equal Protection
Clause of the Fourteenth Amendment and established a three-step eviden-
tiary framework for determining whether peremptory challenges are exer-
cised to exclude jurors impermissibly: First, a defendant must make a
prima facie showing that a peremptory challenge has been exercised on
the basis of race; second, if so, the prosecution must offer a race-neutral
basis for the strike; and third, the court must determine whether the defen-
dant has shown purposeful discrimination. *Wheeler* held that the use of
peremptory challenges to remove prospective jurors on the sole ground of
group bias violates article I, section 13, of the California Constitution. To
the extent the *Wheeler* standard differs from *Batson* (as it does with
respect to step one, *see Johnson v. California*, ___ U.S. ___, 125 S. Ct.
2410 (2005)), the federal standard controls.

standard of review prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), and certified the *Batson* issue for appeal.

In this posture the question before us is narrow: Was the California Court of Appeal determination upholding the peremptory challenge based on a "mixed motive" contrary to, or an unreasonable application of, clearly established federal law as declared by the United States Supreme Court? I conclude that it was not. While *Batson* clearly established that the constitution forbids prosecutors from exercising peremptory challenges purposefully to discriminate against members of a cognizable group, the Supreme Court has never held that the only permissible challenge is one that is based solely on race-neutral reasons. Neither has the Court ever prescribed what test must be applied when a peremptory challenge is based on mixed prosecutorial motives. I would, therefore, affirm.

I part company with my colleagues for the additional reason that the majority grants the writ on the basis of its own "comparative juror" analysis. No record on this score, statistical or otherwise, was adduced at trial, after trial, on appeal, or in any other fashion. No evidence was presented, no arguments were offered, no findings were sought and no findings were made. In my view, appellate judges should not purport to undertake such a fact-intensive process for the first time on collateral review. As there is no clearly established law allowing — let alone requiring — us to do so in the circumstances of this case, I dissent on this footing as well.

## I

Kesser, Jennifer Leahy and Stephen Chiara were charged with first degree murder arising out of Kesser and Leahy's hiring Chiara to kill Kesser's former wife in order to collect the proceeds of her insurance policy. During voir dire the prosecutor exercised a peremptory challenge to excuse Debra

Rindels, a Native American, and to strike alternate jurors Theresa Lawton and Carla Smithfield who were also Native Americans as well as Flordliza Nakata, who appeared to be of Japanese or Filipino descent. When Kesser objected to a pattern of excusing ethnic minorities, the trial court found that Rindels, Lawton and Smithfield were a group of Native Americans and asked the prosecutor to explain his reasons for striking this group. The prosecutor stated that he was "essentially looking for five things" when selecting a juror: is the person someone (1) who can be fair to law enforcement or does the person have some sort of bias against the criminal justice system; (2) who can judge someone else and is strong enough to make a decision and convict a defendant; (3) who will listen to the prosecutor and not find him offensive; (4) who may have bonded with the defense attorney; and (5) who is capable of getting along with the other jurors. The prosecutor indicated that he made notes and gave grades from a high of A to a low of F based on his impression of the questionnaire filled out by the venire panel, responses during voir dire, and what transpired at the hardship proceeding.[2]

Kesser was ultimately convicted of first degree murder and sentenced to life without the possibility of parole. *See* Cal. Penal Code §§ 187(a), 190.2(a)(1), (a)(15). Kesser appealed his conviction, arguing among other things that the prosecutor's use of peremptory challenges constituted *Wheeler/ Batson* error. The court of appeal presumed that a prima facie case had been made out from the trial judge's finding that an identifiable group had been excluded coupled with his request for a statement of reasons from the prosecutor. The court observed that the assumption underlying the prosecutor's disqualification of Rindels — that Native Americans as a group are "anti-establishment" — is itself based on racial stereotype, and that "were this the only or primary reason given by the prosecutor, we would have some cause for concern." *People*

---

[2]The prosecutor's full explanation is set out in the majority opinion at pages 10947-53.

*v. Chiara*, No. A 060502 (Cal. Ct. App., Dec. 12, 1995). However, the court noted, the prosecutor gave many more reasons for his evaluation of Rindels other than views attributed to her as a Native American employed by the tribe, and these reasons are race-neutral. They include that Rindels was pretentious and self-important, emotional about the system, had a daughter who had been molested by her father, which indicated a dysfunctional family, and was unstable, fairly weak and somebody who he thought would be easily swayed by the defense. The court found that these reasons were based on individual predilections supported by the record and that none constituted a sham excuse or could be construed as an effort to disguise group bias. Accordingly, it concluded, "[s]ince the trial court could reasonably have found based on several race-neutral explanations, that the prosecutor's 'predominant motive' in excluding juror Rindels was not ethnic or racial bias, its denial of the *Wheeler* challenge may not be disturbed." The court further found that the fact that Smithfield might be empathetic with Kesser and Leahy because her husband was a recovering alcoholic was a powerful reason that alone justified the exercise of a peremptory challenge, and that the reasons offered for striking Lawton were solid. The California Supreme Court denied Kesser's petition for review without comment. *People v. Chiara*, No. S051306 (Cal., March 14, 1996).

Kesser then petitioned the district court for a writ of habeas corpus, again claiming that the prosecutor had used peremptory challenges to discriminate against Native American jurors. The district court denied the petition. *Kesser v. Cambra*, No. C-96-3452-PJH, 2001 WL 1352607 (N.D. Cal. Oct. 26, 2001) (unpublished disposition).[3] Although it believed that the trial court erred in failing to recognize the bias inherent in striking Rendels in part because she was a Native American employed by the tribe, the district court noted that

---

[3]The court's substantially identical disposition in *Leahy* is published. *Leahy v. Farmon*, 177 F. Supp. 2d 985 (N.D. Cal. 2001).

the California Court of Appeal had recognized that the employment reason was not race-neutral. It concluded that the California appellate court's dual motivation analysis was not contrary to, or an unreasonable application of, clearly established federal law as there is no United States Supreme Court authority holding that articulation of one race-based reason for a strike, along with several race-neutral reasons, requires reversal at the second *Batson* step. Finally, the district court held that the court of appeal's findings that race was not the primary reason given by the prosecutor and that the race-neutral reasons were based on individual predilections rather than group bias are entitled to the presumption of correctness. It found no clear and convincing evidence in the record rebutting the presumption with respect to Rindels, Lawton or Smithfield.

Kesser obtained a certificate of appealability on the *Batson* issue, and timely appealed. A divided panel affirmed, *Kesser v. Cambra*, 392 F.3d 327 (9th Cir. 2004), and we granted rehearing en banc,[4] 425 F.3d 1230 (9th Cir. 2005).

## II

Although the AEDPA standards that constrain our review of state convictions are familiar by now, I repeat them because the *Batson* issue here does not come to us for independent judgment on whether the state courts acted correctly or incorrectly, but for consideration of whether the state court's adjudication of the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the

---

[4]California Appellate Counsel filed an amicus curiae brief in support of Kesser's petition for rehearing en banc, as did the National Association of Criminal Defense Lawyers, California Attorneys for Criminal Justice, and the American Civil Liberties Union of Northern California.

facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003). In applying these standards, we look to the "last reasoned decision" in the state court system, in this case the opinion of the California Court of Appeal. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

"AEDPA's 'clearly established law' requirement limits the area of law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme Court decisions." *Id.* at 1055-56. The phrase "clearly established Federal law, as determined by the Supreme Court," "refers to the holdings, as opposed to the dicta, of [Supreme] Court[ ] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Accordingly, a state court's decision is "contrary to" Supreme Court authority only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412-13.

A state court decision is an "unreasonable application of" Supreme Court authority if it "correctly identifies the correct governing legal rule [from Supreme Court cases] but applies it unreasonably to the facts of a particular . . . case." *Id.* at 407-08. The state court may also unreasonably apply Supreme Court authority if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law," *id.* at 410, and so "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable," *id.* at 411. We may not overturn

a state conviction solely because we may have decided the case differently in the first instance. *See Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000) (as amended).

Under AEDPA, state court findings of fact are presumed to be correct unless the petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004) (as amended). This presumption applies even where the finding was made by a state court of appeals rather than by the state trial court. *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001).

### III

The *Batson* framework is equally familiar, but I repeat it as well:

> Once the opponent of a peremptory challenge has made out a prima facie 'case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

*Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam). "The second step of this process does not demand an explanation that is persuasive, or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Id.* at 768 (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion) (alteration in original)); *id.* at 374 (O'Connor, J., concurring in judgment). As the Court emphasized in *Purkett*, steps two and three are independent inquiries that may not be collapsed into one, and "the ultimate burden of persuasion regarding racial motivation

rests with, and never shifts from, the opponent of the strike."
514 U.S. at 768.

There is no dispute that Kesser made a prima facie showing
of group bias when he objected that three of the prosecutor's
peremptory challenges were used to exclude the only Native
Americans in the pool. It is immaterial that the trial court
made no explicit finding that Kesser had satisfied his *Batson*
step-one burden, because "[o]nce a prosecutor has offered a
race-neutral explanation for the peremptory challenges and
the trial court has ruled on the ultimate question of intentional
discrimination, the preliminary issue of whether the defendant
has made a prima facie showing becomes moot." *Hernandez*,
500 U.S. at 359 (plurality opinion).

The state likewise no longer disputes the presence of one
race-based reason for striking Rindels. Without question, the
prosecutor's assessment of how Native Americans employed
by a tribe view the criminal justice system reflects stereotypi-
cal bias that is inherently discriminatory. To this extent, his
explanation is not facially valid. However, the court of appeal
identified four other facts upon which the prosecutor's expla-
nation was also based that are race-neutral. Kesser contends
that, assuming these other reasons are indeed race-neutral,
their presence does not matter because ethnicity can play *no*
role in the jury selection process.

The Supreme Court has never held that a prosecutor's
explanation must be based *entirely* on race-neutral reasons.
"A neutral explanation in the context of our analysis here
means an explanation based on something other than the race
of the juror." *Id.* at 360. At this stage, we assume the truth of
the proffered reasons, and consider whether, as a matter of
law, the challenge violates the Equal Protection Clause. *Id.* at
359. The Court has clearly said that the prosecutor's burden
at step two is to come forward with *a* race-neutral explana-
tion. *See Miller-El v. Cockrell*, 537 U.S. 322, 328 (2003);
*Purkett*, 514 U.S. at 767 (describing the burden at step two to

come forward with "*a* race-neutral explanation" (emphasis added)); *Hernandez*, 500 U.S. at 358-59 (noting that the prosecutor must offer "*a* race-neutral explanation" for peremptory strikes (emphasis added)); *Powers v. Ohio*, 499 U.S. 400, 409 (1991) (holding that a peremptory challenge cannot be used to exclude an otherwise qualified and unbiased person solely by reason of their race). But the Court has not said that the burden at step two can only be met if *every* reason is race-neutral. Indeed, it passed up the opportunity to address a mixed motive challenge when it denied certiorari in *Wilkerson v. Texas*, 493 U.S. 924 (1989), a case where the prosecutor admitted that race was a factor in his peremptory strike. Justice Marshall (joined by Justice Brennan) dissented from the Court's refusal to grant the petition on the same ground that Kesser urges here, that a prosecutor's exercise of peremptory challenges based in part on racial considerations violates the Equal Protection Clause. They would have held that *Batson*'s requirement of a "neutral" explanation "means just what it says — that the explanation must not be tainted by *any* impermissible factors." *Id.* at 928. However, the Court has not declared this to be the rule, so it cannot be "contrary to . . . clearly established Federal law, as determined by the Supreme Court," *Williams*, 529 U.S. at 412 (quoting 28 U.S.C. § 2254(d)(1)) (omission in original), for the California Court of Appeal to proceed to step three.

Nor can I say that the court of appeal decision is an "unreasonable application" of Supreme Court law. Kesser maintains that *Batson* and its progeny have made clear that a state may not voice racism as a factor in selecting a juror but the Court has not held that step three may be skipped if the reasons produced at step two are (or may be construed as) partly race-neutral and partly not. If anything, the plurality in *Hernandez* suggests the opposite. There, the prosecutor offered an explanation — language ability — for striking two prospective jurors that could be impermissible stereotyping, but also explained that their specific responses and demeanor caused him to doubt their ability to defer to the official translation.

The Court noted that the prosecutor did not rely on language ability without more, and that whether the race-neutral grounds are pretextual should be sorted out at stage three. 500 U.S. at 360, 363-65. The Court's recent opinion in *Rice v. Collins*, No. 04-52 (Jan. 18, 2006), is also instructive. After the defendant had made a *prima facie* showing of racial discrimination in jury selection, the prosecutor offered various reasons for a strike, including a constitutionally impermissible gender-based reason. Reversing this court's view that the trial court should have questioned the prosecutor's credibility because of her attempt to use gender, the Court explained:

> The panel majority assigned the gender justification more weight than it can bear. *The prosecutor provided a number of other permissible and plausible race-neutral reasons*, and Collins provides no argument why this portion of the colloquy demonstrates that a reasonable factfinder must conclude the prosecutor lied about the eye rolling and struck Juror 16 based on her race.

*Id.* at 6 (emphasis added). Like the *Hernandez* plurality, *Rice* indicates that the ultimate burden of persuasion remains on the opponent of the strike to show discrimination even when mixed motives are present.

Kesser also argues that our own decisions apply *Batson* when one of the explanations provided by the prosecutor is not race-neutral, relying upon *United States v. De Gross*, 913 F.2d 1417 (9th Cir. 1990); *United States v. Omoruyi*, 7 F.3d 880 (9th Cir. 1993); and *United States v. Bishop*, 959 F.2d 820 (9th Cir. 1992).[5] These are pre-AEDPA, direct appeal

---

[5]These are the opinions that Kesser relies on. However, there is subsequent history. *De Gross* was later reheard en banc, 960 F.2d 1433 (9th Cir. 1992), with the en banc court reaching the same conclusion as the panel. As for *Bishop*, this court recently noted in *Boyde v. Brown*, 404 F.3d 1159, 1171 n.10 (9th Cir. 2005), that "[t]o the extent *Bishop* suggests that the race-neutrality of an explanation depends on its persuasiveness, it has been effectively overruled by *Purkett*."

cases that do not illuminate what constitutes clearly estab-
lished federal law as determined by the Supreme Court. As
the Court advised in *Williams*, "[i]f this Court has not broken
sufficient legal ground to establish an asked-for constitutional
principle, the lower federal courts cannot themselves establish
such a principle with clarity sufficient to satisfy the AEDPA
bar." 529 U.S. at 381. In any event, we have not read our pre-
cedent as Kesser does because otherwise we would neither
have declined to comment on whether a mixed-motive
defense is valid — as we did in *Johnson v. Vasquez*, 3 F.3d
1327, 1329 n.3 (9th Cir. 1993) — nor indicated that courts
need to determine the prosecution's true motivation where
both valid and invalid reasons are offered — as we have done
several times. *See, e.g.*, *Lewis v. Lewis*, 321 F.3d 824, 831
(9th Cir. 2003) (noting that, when both "faulty" and "ade-
quate" reasons are given, "our precedent suggests that the
court should then step back and evaluate all of the reasons
together"); *McClain v. Prunty*, 217 F.3d 1209, 1221 (9th Cir.
2000) (observing that "[t]he fact that one or more of a prose-
cutor's justifications do not hold up under judicial scrutiny
militates against the sufficiency of a valid reason"); *United
States v. Alcantar*, 897 F.2d 436, 440 (9th Cir. 1990) ("Where
both legitimate and illegitimate reasons are offered by the
prosecution, the need for a meaningful adversary hearing to
discover the true motivation behind the challenges is espe-
cially strong."); *United States v. Thompson*, 827 F.2d 1254,
1260 (9th Cir. 1987) (remanding for further proceedings to
determine whether the prosecutor acted from improper motive
even though race was one reason offered for striking a black
juror). I also note (without expressing any opinion on the mer-
its of their approach, or inferring clarity of federal law from
it) that other circuits have embraced a "mixed motive" analy-
sis in the *Batson* context.[6] In these circumstances I disagree

---

[6]*See, e.g.*, *Howard v. Senkowski*, 986 F.2d 24 (2d Cir. 1993) (adopting
the dual motivation analysis in *Mt. Healthy City Sch. Dist. Bd. of Educ.
v. Doyle*, 429 U.S. 274, 284-87 (1977), and *Vill. of Arlington Heights v.
Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 n.21 (1977), and holding that
if the claimant proves discriminatory motivation, the accused party may

with Kesser's argument that the California Court of Appeal's decision was an objectively unreasonable application of *Bat*

*son.*

Alternatively, Kesser submits that even if a mixed motive analysis were appropriate, it was incorrectly applied because the prosecutor did not show that he would have exercised his challenge solely for race-neutral reasons. I recognize that the burden does shift in this way to the party accused of taking an unlawfully discriminatory action in analogous contexts that employ a mixed motive analysis, *see, e.g., Mt. Healthy*, 429 U.S. 274; *Arlington Heights*, 429 U.S. 252; *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003),[7] but I am not persuaded to

show that the improper motivation was only part, and not the decisive part, of the motivation); *Gattis v. Snyder*, 278 F.3d 222, 231-35 (3d Cir. 2002) (holding that the state courts' application of dual motivation analysis to a *Batson* challenge did not result in a decision contrary to, or an unreasonable application of, federal law under § 2254(d)(1)); *Jones v. Plaster*, 57 F.3d 417, 418-22 (4th Cir. 1995) (holding that if a party exercises a peremptory challenge in part for a discriminatory purpose, a trial court must decide whether the party whose conduct is being challenged has demonstrated by a preponderance of the evidence that the strike would have nevertheless been exercised even if an improper factor had not motivated in part the decision to strike); *United States v. Darden*, 70 F.3d 1507, 1530-32 (8th Cir. 1995) (holding that the trial court's decision to allow a strike on the basis of several racially neutral reasons, despite one reason that was not racially neutral, was equivalent to a finding that the prosecutor would have exercised the strike even without the one non-racially neutral motive); *Wallace v. Morrison*, 87 F.3d 1271, 1274-75 (11th Cir. 1996) (per curiam) (holding that dual motivation analysis as adopted by the Second Circuit in *Howard* determines whether a prosecutor violates a defendant's equal protection rights under *Batson* when the prosecutor considers both race and race-neutral factors in exercising a peremptory strike).

[7]As set out in *Arlington Heights*,

Proof that the decision . . . was motivated in part by a racially discriminatory purpose would not necessarily have required invali-

reverse or to remand for a hearing on this account. First, as this comes to us on collateral review of a state conviction, we would be neither adopting nor rejecting a mixed-motive analysis as the law of this circuit for all *Batson* cases. When and if we are required to decide whether a mixed-motive analysis *should* be adopted in the *Batson* context, we will no doubt have to consider whether, and how, the conventional mixed-motive concept fits into the *Batson* evidentiary framework. Here, however, our only concern in this case is whether the California Court of Appeal's decision was an unreasonable application of *Batson*. Its approach could be incorrect (something which it is unnecessary to decide), yet not be unreasonable. Given *Purkett*'s clear injunction that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike," 514 U.S. at 768, it cannot have been contrary to, or an unreasonable application of, *Batson* for the court of appeal not to treat the prosecutor's position as a "defense" or explicitly to impose a burden on the prosecutor that *Batson* puts squarely on the opponent. Further, as the Supreme Court has instructed, "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) — whether a state court decision is contrary to, or involved an unreasonable application of, clearly established federal law." *Andrade,* 538 U.S. at 71. Thus, while we, or the Court in other contexts, may prefer a "but for" test when motives are mixed, *see, e.g.*, *Mt. Healthy*, 429 U.S. at 285-97, to the formulation of "primary" or "predomi-

---

dation of the challenged decision. Such proof would, however, have shifted to the [decision maker] the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision.

429 U.S. at 270 n.21.

nant" motive used by the California Court of Appeal in this case, I would abjure imposing a single formulation for purposes of AEDPA review in this case. Finally, the California Court of Appeal allowed the strike on the basis of a number of racially neutral, non-pretextual reasons that were the primary reasons for the challenge. This amounts to a finding that the prosecutor would have exercised the challenge even without the race-based reason.[8] Accordingly, even if the evidentiary framework for conventional mixed-motive cases is transposed to the *Batson* context, for purposes of habeas review under AEDPA, the California court did not unreasonably apply federal law.

## IV

Kesser makes a number of related arguments that boil down to disagreement with the California Court of Appeal's determination that the prosecutor's primary motivation for striking Rindels was not pretextual and that his reasons for striking Lawton and Smithfield were not race-based at all. "[A] state court's finding of the absence of discriminatory intent is 'a pure issue of fact' accorded significant deference . . . ." *Miller-El*, 537 U.S. at 339 (quoting *Hernandez*, 500 U.S. at 365). Under AEDPA, we may not grant a writ unless the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "Factual determinations by state courts are presumed correct absent clear and convincing

---

[8]Courts that have adopted a mixed motive analysis for *Batson* cases have implied burden-shifting from a decision upholding a strike. *See, e.g.*, *Darden*, 70 F.3d at 1531; *Weaver v. Bowersox*, 241 F.3d 1024, 1032 (8th Cir. 2001); *United States v. Tokars*, 95 F.3d 1520, 1533 (11th Cir. 1996). *But see Jones*, 57 F.3d at 421 (remanding a § 1983 case on direct appeal because the record did not indicate whether the district court determined if the prosecutor carried his burden of showing that he would have struck a juror even if the strike had not been motivated in part by an improper purpose).

evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

Kesser points to the prosecutor's improper reason for challenging Rindels, and to the fact that he challenged two additional Native American veniremembers as alternates.[9] As explained, I would conclude that the legal standard applied by the Court of Appeal was not contrary to, or an unreasonable application of, clearly established federal law. Beyond this, the Court of Appeal found that the prosecutor's race-based reason for striking Rindels was not the primary reason for the challenge, and that the primary reasons were race-neutral, based on individual predilections, and were not pretextual. While reasonable minds could differ about this, and the court undoubtedly could have found that stereotypical reasoning so permeated the prosecutor's explanation that his challenge was group-based rather than individual-based, the court of appeal's contrary determination is not without support in the record. The prosecutor offered several ethnic-neutral reasons for striking Rindels. Kesser does not argue that these reasons are not in fact ethnic-neutral, but rather that we should not defer to the California appellate court's determination because its review, like ours, is on a cold record. However, this argument is foreclosed by well-settled law that deference is due to state court findings regardless of whether made by a trial or appellate court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981) (applying the pre-AEDPA version of 28 U.S.C. § 2254(e)(1)); *Bragg*, 242 F.3d at 1087.

---

[9]Kesser also contends that the prosecutor improperly excused Nakata, but the trial court did not find that a prima facie case of racial or ethnic bias had been made as to her. In addition, the claim is unexhausted as Kesser's petition for review in the California Supreme Court failed to raise any issue with respect to Nakata.

Kesser also faults the district court and the California Court of Appeal for limiting their analyses to Rindels, and failing to extend the prosecutor's discriminatory reason for striking Rindels to the other two Native Americans. The court of appeal acknowledged the pattern, but found that the explanations for striking Lawton and Smithfield were race-neutral. Kesser points to no clear and convincing evidence that this finding is incorrect. Smithfield claimed hardship, and her husband was a recovering alcoholic like Leahy and Kesser which could cause her to be unduly empathetic. Lawton's encounters with law enforcement gave rise to concern about resentment, she had to commute a long ways, she was not overly educated and said she would have trouble talking audibly in court, and she had followed a high-profile trial in which Kesser's counsel was the trial attorney, which might lead to her being influenced by him. Even though a court may infer an "invidious discriminatory purpose" from the fact that a prosecutor challenges each member of a cognizable group, *Hernandez*, 500 U.S. at 363; *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994), the finding here that strikes of two group members were individually-based and that the individually-based reasons for striking the remaining member were not pretextual is not "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, Kesser faults the court of appeal and the district court for failing to conduct a comparative juror analysis, and argues that either we or the district court should do so. However, he did not press a comparative analysis at trial and developed no factual basis to support one. 28 U.S.C. § 2254(e)(2). This is quite different from *Miller-El*, where the Supreme Court endorsed comparative analysis based on testimony, arguments, and findings, 537 U.S. 331-34, and *Burks*, where "the *Batson* issue was clearly fought along comparative lines in the trial court," 27 F.3d at 1428. Absent any such record for comparing challenged jurors to unchallenged jurors, I cannot say that Kesser has adduced clear and convincing evidence that the challenge was purposefully discrim-

inatory. Nor do I believe we should conduct a comparative analysis de novo.

V

In sum, as a federal habeas court our review of the California Court of Appeal determination upholding a peremptory challenge that was based on mixed prosecutorial motives is limited to whether it was contrary to, or an unreasonable application of, federal law as articulated by the United States Supreme Court. The Court has never addressed mixed motives in the *Batson* context, so the California court's decision to proceed past step two of the *Batson* analysis to determine whether the prosecutor's race-neutral reasons were pretextual is not contrary to clearly established federal law. It is not necessary for us to embrace the specifics of the approach the California court employed as correct — and I would not — in order to hold, as I would, that its decision was not an objectively unreasonable application of *Batson*. It follows from finding that non-racial reasons were the primary motivation for striking Rindels that the prosecutor did not exercise his peremptory challenge "on account of" race or racially-based assumptions about qualifications to serve, *Batson*, 476 U.S. at 86, or, put differently, that he would have exercised the challenge even without the non-racially neutral reason. Therefore, I cannot say that the California Court of Appeal's application of mixed-motive principles resulted in a decision contrary to, or unreasonably applying, federal law as determined by the Supreme Court of the United States.

Accordingly, I would affirm.